## Hoskins v. Turner.

Oct. 24, 1941.

C. W. Hoskins and C. A. Noble for appellant.

J. H. Asher and B. P. Wootton for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellant and appellee sought nomination for the office of county attorney of Leslie County on the Republican ballot at the August, 1941, primary. Hoskins received 1,312 and Turner 1,678 votes; the election commissioners issued certificate to Turner.

Hoskins in his petition charged that Turner did not file post election expense account as required by law, and had violated the Corrupt Practice Act, Kentucky Statutes, Section 1565b-1 et seq., in that prior to and on the day of the election he, with others, formed a pool

or "slush" fund and used it in influencing voters to vote for a slate, including Turner. Further that Turner and others for him, with his knowledge and consent, "used money and other things of value to, and did influence voters to vote for Turner, and that said votes so bought and influenced were counted for Turner." That because of the alleged violations Turner is not entitled to certificate; he prays that it be held null, and he be issued certificate of nomination. Hoskins alleges that he did not violate the provisions of the Act.

Turner filed demurrer and motion to require Hoskins to make his charges more definite and certain; both were overruled. Without waiving Turner answered, merely denying the charges. Proof was taken by depositions, and upon submission the court dismissed Hoskins' petition.

Counsel in brief claims that his client was prejudiced because Turner, upon appellant's insistence, refused to submit himself to inquiry as if on cross-examination. Civil Code, Section 606, subd. 8. This matter is not subject to review since the procedure laid down in Netter v. Caldwell, 173 Ky. 200, 190 S. W. 721; Christian's Adm'x v. Ennis, 173 Ky. 101, 190 S. W. 675, was not pursued.

At the outset we may dismiss from consideration the charge of formation of a pool or building up a "slush" fund, and the charge that appellee lost his right by failing to file post election account. There is a total lack of proof on the first subject, and the record shows that he did file the account. A copy was introduced, but for some reason is not in the record, and because of this fact reference to it for comparative purposes may not be indulged.

We have read the evidence carefully and are enabled to say that the greater part is of trivial nature, which in no wise tends to show that Turner used money or other property for the purpose of influencing voters, or that any one else did so with his knowledge or by his consent. Some testimony was of such little importance as not to elicit comment by counsel. A great deal of the evidence is of such quality as not to cast suspicion on appellee.

As exemplary we might point to the testimony of two witnesses, who say that Will Sizemore was working

for Turner in Thousandsticks precinct. He had a pint of whisky and took two voters up the hill and gave them a dram; asked them to vote for Turner, and they went in the direction of the polls. Neither of the voters agreed to vote for Turner, and there is total failure to show that Turner had ever authorized Sizemore to interest himself in his behalf.

Turner's testimony is emphatic in denial. One other example—Felix Maggard, a minister of the Gospel and justice of the peace, apparently quite busy around the polls in Cutshin precinct, says that a day or two before the primary he heard Turner say he was "aiming to send $50 to Cutshin for Will Lewis to use," and that Lewis was in that precinct working for Turner; he and Lewis were at the polls all day, but he did not see Lewis use any money. Comment is unnecessary except to say that appellant says he had no arrangement with Lewis, and did not send "one penney" to Cutshin precinct.

However, we will take up several instances in proof which counsel contends—when taken in consideration with what may be inconsequentials—manifested violations of the act on the part of Turner. Albert Hoskins operates a store at the Mouth of Stinnett. Several days before the election Turner and McKinley Asher came to his store; Asher took witness to the rear and said to him, "We need another hundred dollars." He understood that "Turner and Asher wanted to borrow a hundred dollars." Hoskins declined the invitation. He was not sure whether Turner heard the communication or not. He also said that he (Hoskins) was surety on some sort of official bond and that Asher said "if we can elect Turner he wont press the bond case on us." Turner's explanation of this dispels the idea of corrupt motives. He said that Asher claimed that Hoskins was for him, and he insisted that Hoskins was against him. "We went up there to test him out and we did."

Mack Wilson (democrat) saw Turner in Hyden the day before the election; Turner gave him $10 to take to Jake Napier. Turner says this was true. He had made arrangements with Napier to use his truck in hauling voters to the polls, agreeing to pay $10. After the election Napier saw Turner and told him that he had only hauled a few voters and returned him $5 saying that sum was sufficient for services rendered. It is not hinted that Napier was a vote buyer. The proof was

that he was an honest, upright citizen. The return of the unearned $5 lends weight.

John Sizemore was in Hyden some time prior to election day. He told Turner he had spent all his money and needed more. He does not say that Turner had therefore given him any money. He did not know whether Turner gave him the money or "just loaned it to him," but that he and Turner went to a room in the Lewis Hotel, and he (Sizemore) "looked down on the bed and saw some money there and picked it up. It might have been one dollar bills, or two dollar bills, or more; I never counted it. If Turner said anything he told me to do whatever I wanted to do with it." And he evidently did, if he got the money, since he proceeded to "spend it about town here, with the boys, first one and then another." He was positive that he didn't buy a vote or try to buy a vote for Turner; in fact, he said, "I never tried to buy a vote in my life from nobody." It is hardly necessary to quote Turner on this point, except to say that he says he gave Sizemore no money for any purpose, and was not in the Lewis Hotel during his campaign.

Ardill Colwell was in Asher's store several days before the election. Turner was there and had "something between thirty, forty or fifty dollars in one dollar bills." Colwell said to him, "Give me about $25 and I'll help carry Howard for you." Turner did not comply with his request. "If he had give me the money, I wouldn't have took it; wouldn't have offered to; I wouldn't have took their money because I was agin him. I voted for Hoskins." Turner admits the colloquy, but said the whole think was in joke, as apparently Colwell thought.

Bret Baker (democrat) says he got $5 from Turner, and another $5 to send to Ellen Smith, in Bowling precinct. Baker says this was to be used to bring voters in. "He told me to do what I could in getting the voters all in and I did that; hired Daniel Smith for one to go after voters." He was positive he did not buy any votes. He was more particularly interested in his brother's race, "but he wanted them to vote for Turner if they would, I didn't ask them to vote for him." He said that he later sent the $5 to Ellen Smith, "But she didn't show up at the polls."

Other proof shows that due to natural reasons Ellen was not in condition to take part in the election; her husband did not vote, and whether he is the Daniel Smith who helped Baker is not developed. Here again it becomes unnecessary to comment on Turner's testimony in regard to the Baker transaction.

A bank cashier was required to produce Turner's bank statement for the month of July. This shows periodical withdrawals in amounts from 25c earlier to $280 on July 16th. His statements for other months preceding and following election day were also introduced, and while the July account is somewhat larger in periodical withdrawals, it shows nothing damaging or alarming, the total being considerably below the amount one is permitted to expend legitimately.

It is also shown that Turner was engaged in timber and lumbering business, with incident expenses. About the only proof that might indicate that Turner stepped over bounds is that of John Salyers, who says that Turner was "fooling around in Hyden all day of the election." Babe Causey was there working for Turner. He (Salyers) saw Carlo Collins come out of the court house and talk to Turner and Babe; they talked a "few words and went into a coal shed and Turner gave her some money, and he came out and Carlo went in and came out of the house with a one dollar bill."

It is definitely shown that Turner was in Wooten precinct until 2:30 of election day, when he came to Hyden for the purpose of taking his wife to their precinct to vote. He was in Hyden not more than 15 minutes. He did not know Babe Causey, but did know Mallie Causey who was about the polls, but he gave her no money, nor did he go to the coal house. Carlo Collins was not a voter in Hyden; he was for Hoskins. He denied the going into the coal house, or receiving one dollar or any other sum from Turner or Mallie Causey. It may be remarked that there was no criticism of activities at Wooten, where Turner worked the greater part of the day.

It is unnecessary to detail other proof, since we find none which would lead to a conclusion that appellant violated the Corrupt Practice Act. Neither is it necessary to quote from cases wherein we have held that before one may be deprived of office or nomination be-

cause of alleged violation of the Act it must be shown by convincing evidence that the one charged must himself have violated its provisions, or that it was violated by another with his knowledge, consent or procurement. Many such are cited in Gross v. Cawood, 270 Ky. 264, 109 S. W. (2d) 597.

Upon the whole case we are convinced that contestant failed completely in his effort to show that Turner was not entitled to a certificate of nomination. It follows that we must hold that the chancellor properly dismissed contestant's petition.

Judgment affirmed.